IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
ORANGEBURG DIVISION

| | | |
|---|---|---|
| CONGAREE RIVERKEEPER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. <u>5:26-cv-2417-MGL</u> |
| | ) | |
| ALPEK POLYESTER USA, LLC and | ) | |
| EASTMAN CHEMICAL COMPANY, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## <u>INTRODUCTION</u>

1.      This is a case under the Clean Water Act and Resource Conservation and

Recovery Act ("RCRA") to stop Defendants Alpek Polyester USA, LLC ("Alpek") and Eastman

Chemical Company ("Eastman") from polluting the Congaree River and Congaree National Park

with harmful microplastics, a toxic chemical called 1,4-dioxane, and excessive organic waste.

2.      Alpek and Eastman co-operate a large industrial plant on the banks of the

Congaree River in Gaston, SC (the "Alpek-Eastman Plant" or "Plant"), where they manufacture

tiny plastic pellets called "nurdles." The Plant's microplastic pellets are sold to produce larger

plastic products.

3.      After years of poor controls and operational practices, the Alpek-Eastman Plant

has released large numbers of microplastic pellets onto the lands and waters surrounding the

Plant and extending at least **26 miles downstream**. The Plant is discharging substantial numbers

of pellets into the Congaree River, where the microplastics flow many miles to pollute South

Carolina's only National Park, Congaree National Park. This microplastic pollution violates

multiple provisions of the Plant's National Pollutant Discharge Elimination System ("NPDES")

permit, Ex. 1 at 69–124 (the "Permit"), which was issued to ensure compliance with the Clean Water Act. The Permit does not authorize the Plant to discharge pellets into the Congaree River. As a result, these discharges plainly violate the Clean Water Act, 33 U.S.C. §§ 1311(a), 1342.

4.      In April, the U.S. Environmental Protection Agency ("EPA") and the U.S. Department of Health and Human Services reaffirmed that microplastics present "a growing threat to human health."[1] Once released into the environment, plastic pellets do not decompose and instead break down into smaller and smaller microplastics that can persist for centuries. Microplastic pellets often consist of harmful chemicals and "sorb" additional toxic chemicals present in surrounding waters, creating a "cocktail of contaminants." Microplastics are regularly ingested by fish, birds, and other animals, which mistake them for food, and are transferred into people who eat contaminated fish or drink contaminated water. Microplastics can build up in the arteries, organs, and tissue of humans and wildlife, creating a myriad of health risks.

5.      In addition to violating the Clean Water Act, the significant microplastic pollution from the Alpek-Eastman Plant is causing and contributing to "an imminent and substantial endangerment to health or the environment" in violation of RCRA, 42 U.S.C. § 6972(a)(1)(B).

6.      The Alpek-Eastman Plant is also discharging large amounts of 1,4-dioxane into the Congaree River. 1,4-Dioxane is a chemical byproduct of plastic manufacturing and a likely carcinogen. The Plant discharges 1,4-dioxane directly from its outfall and also through groundwater and into the Congaree as it leaches from several poorly-lined wastewater treatment ponds near the banks of the River. EPA has set a human health advisory for 1,4-dioxane of 0.35

---

[1] U.S. Environmental Protection Agency, *EPA, HHS Announce Historic Actions to Protect Americans from Microplastics and Safeguard Drinking Water*, Apr. 2, 2026, *available at* https://www.epa.gov/newsreleases/epa-hhs-announce-historic-actions-protect-americans-microplastics-and-safeguard, and https://perma.cc/NFP4-K2PG (permanent link).

parts per billion. Levels of 1,4-dioxane in the Plant's effluent have reached over **20,000 times higher** than EPA's health advisory, while groundwater under the Plant has reached over 1,600 times higher than the health advisory. This 1,4-dioxane pollution is particularly concerning because the S.C. Department of Environmental Services ("SCDES") has determined that the Plant's discharges have the "potential to affect" a public drinking water source downstream.

7.     Here again, the NPDES Permit does not authorize the Alpek-Eastman Plant to discharge 1,4-dioxane. The Plant's discharges of 1,4-dioxane into the Congaree River, both directly and through groundwater, violate the Permit and the Clean Water Act, 33 U.S.C. §§ 1311(a), 1342.

8.     Through years of operation, the Alpek-Eastman Plant has deposited and disposed of large amounts of 1,4-dioxane and microplastics in and around the Plant—including in its poorly-lined wastewater treatment ponds, the groundwater under the ponds, the floodplain on the banks of the Congaree, and in the River itself. The Plant's disposal of these solid and hazardous wastes constitutes an "open dump" and "open dumping" in violation of RCRA, 42 U.S.C. § 6945(a).

9.     Lastly, the Alpek-Eastman Plant has repeatedly violated the Permit's limits on discharges of Biochemical Oxygen Demand ("BOD") for well over a decade. High BOD levels indicate excessive organic waste in the Plant's effluent, which threatens aquatic life and fisheries. The Plant's high discharges of BOD violate the Permit and the Clean Water Act, 33 U.S.C. §§ 1311(a), 1342.

10.     Alpek and Eastman's pollution harms the mission and members of Plaintiff Congaree Riverkeeper, a non-profit organization dedicated to protecting and improving water quality, wildlife habitat, and recreation on the Congaree River. Plaintiff's members own property

and drinking water wells, fish, swim, boat, and paddle downstream of the Plant's pollution, which harms their aesthetic and recreational enjoyment of their property, the Congaree River, and the National Park.

11.     To cure these violations and remedy the harm to Congaree Riverkeeper and its members, Plaintiff respectfully seeks an order from this Court declaring that Defendants are violating: (i) the Clean Water Act, due to the Plant's unpermitted discharges of plastic pellets, 1,4-dioxane, and excessive levels of BOD, and (ii) RCRA, due to the imminent and substantial endangerment caused by the Plant's microplastic pollution, and due to the Plant's "open dumping" of microplastics and 1,4-dioxane in the floodplain and in the River. Plaintiff further seeks an injunction compelling Defendants to cease and remediate this unlawful pollution.

## JURISDICTION AND VENUE

12.     Plaintiff Congaree Riverkeeper brings its Clean Water Act claims (Counts I–IV) under the citizen suit provisions of the Clean Water Act, 33 U.S.C. § 1365(a)(1), and its RCRA claims (Counts V–VI) under the citizen suit provisions of RCRA, 42 U.S.C. § 6972(a)(1)(A)-(B).

13.     This Court has federal question jurisdiction under 28 U.S.C. § 1331 and may grant declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201(a) and 2202, 33 U.S.C. § 1365(a) (as to the Clean Water Act claims), and 42 U.S.C. § 6972(a) (as to the RCRA claims). The Court may assess civil penalties and litigation costs for Clean Water Act violations under 33 U.S.C. §§ 1365(a), (d) and 1319(d), and for RCRA violations under 42 U.S.C. §§ 6972(a), (e) and 6928(g).

14.     Venue is proper in the District of South Carolina under 28 U.S.C. § 1391(b)(1) and (2) because Defendants Alpek and Eastman "reside" in South Carolina and a "substantial part of the events or omissions giving rise to the claim occurred" in South Carolina—namely, the

4

unpermitted discharges, open dumping, and imminent and substantial endangerment alleged in this suit, which are occurring at, around, and downstream of the Alpek-Eastman Plant located at 570 K Avenue in Gaston, SC.[2] For these reasons, and because Defendants "do[] business relating to the events or omissions alleged" at the Plant located in Calhoun County, venue is proper in the Orangeburg Division encompassing Calhoun County under Local Civil Rule 3.01(A)(1).

15.     Pursuant to 33 U.S.C. § 1365(b)(1) and 42 U.S.C. § 6972(b)(1)–(2), Plaintiff initiates this action 60 days or more after giving written notice of the Clean Water Act and RCRA open dumping claims, and 90 days or more after giving written notice of the RCRA imminent and substantial endangerment claim, to the Administrator of the EPA, SCDES, and alleged violators Alpek and Eastman. Ex. 1 (notice of intent to sue, sent via registered and certified mail on September 10, 2025).

16.     Neither EPA nor South Carolina has commenced or is diligently prosecuting a civil or criminal action in any state or federal court to address the violations of the Clean Water Act or RCRA asserted in this suit, *see* 33 U.S.C. § 1365(b)(1)(B); 42 U.S.C. § 6972(b)(1)(B), nor have they taken any of the other actions specified in 42 U.S.C. § 6972(b)(2)(B)–(C) to address such violations.

## PARTIES

### I.     Plaintiff

17.     Plaintiff Congaree Riverkeeper is a 501(c)(3) non-profit organization headquartered in Columbia, SC, with approximately 200 members and supporters, primarily in the greater Columbia area. Congaree Riverkeeper was founded to protect and improve water

---

[2] Venue is mandatory in this District for Plaintiff's Clean Water Act and RCRA claims because Defendants' violations of both statutes are occurring in this District. 33 U.S.C. § 1365(c)(1); 42 U.S.C. § 6972(a).

quality, wildlife habitat, and recreation on the Broad, Lower Saluda, and Congaree Rivers through advocacy, education, and where necessary, the enforcement of environmental laws.

18. Members of the Riverkeeper own property and drinking water wells, fish, swim, hunt, boat, paddle, and recreate in and along the Congaree River and National Park downstream from the Alpek-Eastman Plant. The Plant's pollution harms members' use and enjoyment of these scenic areas. As one example, member Mark Salley owns 1,800 acres of land and a family farm on the Congaree River directly across from Congaree National Park. Mark and his family cherish swimming and fishing off sandbars in the River along his property, particularly for striped bass. Mark has observed plastic pellets littering the sandbar he has used since childhood. Mark has significant concerns about how microplastics, 1,4-dioxane, and organic waste from the Plant will affect water quality and fish. Mark does not wish to swim or fish in a river containing microplastics and other industrial pollution. The Plant's pollution has harmed Mark's enjoyment of swimming and fishing in the Congaree and has made him concerned about eating fish from the River. The observable plastic litter also harms Mark's enjoyment of the tranquil waters and scenery along his property.

## II.     **Defendants**

19. Defendant Alpek Polyester, USA, LLC is incorporated in Delaware and headquartered in Charlotte, NC. Alpek is a multinational petrochemical company and one of the world's largest producers of common plastic precursors purified terephthalic acid ("PTA") and polyethylene terephthalate ("PET"). Alpek operates 30 plants across 9 countries, including the Alpek-Eastman Plant, where Alpek and Eastman produce PTA and PET resins, which are formed into microplastic pellets.

20.     Defendant Eastman Chemical Company is incorporated in Delaware and headquartered in Kingsport, Tennessee. Eastman is a major chemical manufacturer with 36 plants in 13 countries, including 13 plants in the United States. Eastman co-operates the Alpek-Eastman Plant.

**LEGAL FRAMEWORK**

**I.      The Clean Water Act**

21.     In 1972, Congress passed the Clean Water Act "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). The Act established "the national goal that the discharge of pollutants into navigable waters be eliminated." *Id.* § 1251(a)(1).

22.     To achieve these objectives, the Clean Water Act prohibits the discharge of "any pollutant"[3] from a "point source"[4] to "waters of the United States,"[5] *id.* §§ 1311(a), 1362(7), (12), except in compliance with, among other conditions, a NPDES permit issued under Section 402 of the Act, *id.* § 1342. The Act requires a NPDES permit not only for direct discharges into waters of the United States, but also for indirect discharges that reach waters of the United States

---

[3] The Act defines "pollutant" as "dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water." 33 U.S.C. § 1362(6).

[4] The Clean Water Act defines "point source" as "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged." 33 U.S.C. § 1362(14).

[5] Relevant here, "waters of the United States" encompasses waters such as the Congaree River that are "relatively permanent, standing or continuously flowing bodies of water forming geographical features that are described in ordinary parlance as 'streams, oceans, rivers, and lakes.'" *Sackett v. EPA*, 598 U.S. 651, 671 (2023) (citations, quotations, and alterations omitted).

through groundwater or other media and are the "functional equivalent of a direct discharge." *Cty. of Maui v. Hawaii Wildlife Fund*, 590 U.S. 165, 183–84 (2020) (emphasis omitted).

23.     In addition to regulating wastewater discharges, the Clean Water Act also requires a NPDES permit for discharges of stormwater "associated with industrial activity." 33 U.S.C. § 1342(p).

24.     The Clean Water Act tasks EPA with enforcing the NPDES program. 33 U.S.C. § 1342. In South Carolina, EPA has delegated its authority to administer the NPDES permitting program to SCDES.

25.     Once issued, a NPDES permit holder may only discharge those pollutants that were: (*i*) disclosed to the permitting agency in the application for a NPDES permit, and (*ii*) within the reasonable contemplation of the agency at the time the permit was issued. "[T]o the extent that a permit holder discharges a pollutant that it did not disclose, it violates the NPDES permit and the CWA." *Piney Run Preservation Ass'n v. Cty Comm'rs*, 268 F.3d 255, 268 (4th Cir. 2001); *see also S. Appalachian Mountain Stewards v. A&G Coal Corp.*, 758 F.3d 560, 565–68 (4th Cir. 2014).

26.     Any violation of a NPDES permit constitutes a violation of the Clean Water Act itself. 33 U.S.C. § 1365(f). Each discharge of a pollutant that is not authorized by a NPDES permit constitutes a separate violation of the Clean Water Act. *See* 33 U.S.C. §§ 1311(a), 1319(d).

27.     The Clean Water Act provides that "any citizen may commence a civil action on his own behalf . . . against any person[6] . . . who is alleged to be in violation of [] an effluent standard or limitation under this chapter." 33 U.S.C. § 1365(a)(1). The Clean Water Act defines

---

[6] The term "person" includes corporations. 33 U.S.C. § 1362(5).

"effluent standard or limitation" enforceable via citizen suit to include, among other things: (i) "an unlawful act under subsection (a) of section 1311 of this title"—i.e., the unpermitted discharge of any pollutant, *id.* §§ 1365(f), 1311(a); and (ii) the violation of "a permit or condition of a permit issued under section 1342 of this title,"—i.e., a NPDES permit, *id.* §§ 1365(f), 1342.

28.    In a citizen suit, violators are subject to a civil penalty of up to $68,445 per day for each violation, 33 U.S.C. § 1319(d); 40 C.F.R. § 19.4 (adjusting statutory penalties for inflation), in addition to declaratory and injunctive relief and litigation costs. 33 U.S.C. § 1365.

## II.    The Resource Conservation and Recovery Act

29.    RCRA "is a comprehensive environmental statute that governs the treatment, storage, and disposal of solid and hazardous waste." *Goldfarb v. Mayor & City Council of Balt.*, 791 F.3d 500, 504 (4th Cir. 2015) (quoting *Meghrig v. KFC W., Inc.*, 516 U.S. 479, 483 (1996)). RCRA's "primary purpose . . . is to reduce the generation of hazardous waste and to ensure the proper treatment, storage, and disposal of that waste which is nonetheless generated, so as to minimize the present and future threat to human health and the environment." *Meghrig*, 516 U.S. at 483.

30.    Relevant here, RCRA contains two central protections: (*i*) the prohibition on the handling, storing, treatment, transportation or disposal of solid or hazardous waste which "may present an imminent and substantial endangerment to health or the environment," 42 U.S.C. § 6972(a)(1)(B), and (*ii*) the prohibition on the "open dumping" of solid or hazardous waste. *Id.* § 6945(a).

### a.  Imminent and Substantial Endangerment

31.    RCRA allows affected citizens to file suit against:

> [A]ny person, . . . including any past or present generator, past or present transporter, or past or present owner or operator of a

9

treatment, storage, or disposal facility, who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment.

42 U.S.C. § 6972(a)(1)(B). "[S]ubsection (a)(1)(B) authorizes so-called 'imminent and substantial endangerment' claims to be brought against a defendant whose conduct—whether ongoing or purely in the past—'may' now pose an 'imminent and substantial endangerment to health or the environment.'" *Goldfarb.*, 791 F.3d at 505.

32.    By using the phrase "'*may present* an imminent and substantial endangerment,'" Congress did not limit enforcement to "emergency" situations, but rather "authoriz[ed] the issuance of injunctions when there is but a risk of harm." *United States v. Waste Indus. Inc.*, 734 F.2d 159, 165 (4th Cir. 1984) (emphasis in original, citation and quotations omitted). "Plaintiffs must establish only that [defendant] released waste 'of a type that could contribute to' the endangerment that may exist." *Maine People's All. v. Holtrachem Manuf. Co., LLC*, 211 F. Supp. 2d 237, 255 (D. Me. 2002) (quoting *Prisco v. A&D Carting Corp.*, 168 F.3d 593, 609 (2d Cir. 1999)).

33.    RCRA defines "solid waste" covered by Subsection (a)(1)(B) as "any garbage, refuse, sludge from a waste treatment plant . . . and other discarded material . . . resulting from industrial . . . operations." 42 U.S.C. § 6903(27). Although not defined in RCRA, the phrase "other discarded material" has been interpreted "expansive[ly]" by federal courts to include material released into the environment from an industrial site contrary to its intended use. *E.g.*, *Charleston Waterkeeper v. Frontier Logistics, L.P.*, 488 F. Supp. 3d 240, 254–57 (D.S.C. 2020) (nurdles released by facility into Charleston Harbor were "discarded material" under RCRA).

10

**b. Open Dumping**

34.     In addition to substantial endangerment, RCRA prohibits "any solid waste management practice or disposal of solid waste or hazardous waste which constitutes the open dumping" of that waste. 42 U.S.C. § 6945(a). An "open dump" refers to "any facility or site where solid waste is disposed of which is not a sanitary landfill which meets the criteria promulgated under section 6944 of this title and which is not a facility for disposal of hazardous waste." *Id.* § 6903(14).

35.     RCRA broadly defines "disposal" as "the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters." 42 U.S.C. § 6903(3). RCRA's definition of "disposal" covers the "movement of the waste after it has been placed in a state of repose[.]" *Waste Indus. Inc.*, 734 F.2d at 164.

36.     EPA has promulgated criteria to clarify what facilities and practices constitute "open dumps" and "open dumping . . . prohibited under Section 4005 of [RCRA]." 40 C.F.R. § 257.1(a)(1)–(2). The regulations provide that "[f]acilities or practices in floodplains shall not . . . result in washout of solid waste, so as to pose a hazard to human life, wildlife, or land or water resources." *Id.* § 257.3-1(a). The "washout" of waste is defined as the "carrying away of solid waste by waters" of at least a 100-year flood. *Id.* § 257.3-1(b)(1), (3). "'Carrying away' does not require ongoing human conduct" and covers the "movement of previously disposed solid waste." *Potomac Riverkeeper, Inc. v. Nat'l Cap. Skeet & Transp. Club, Inc.*, 388 F. Supp. 2d 582, 587 (D. Md. 2005).

37.     When state and federal authorities do not act to address violations, *see* 42 U.S.C. § 6972(b), RCRA provides that "any person may commence a civil action on his own behalf . . . against any person . . . who is alleged to be in violation of any permit, standard, regulation, condition, requirement, prohibition, or order which has become effective pursuant to [RCRA]." *Id.* § 6972(a)(1)(A). This includes open dumping in violation of RCRA and EPA's regulations.

38.     In citizen suits, RCRA provides for declaratory and injunctive relief to address violations, 42 U.S.C. § 6972(a), and civil penalties of up to $93,058 per day for each violation. *Id.* § 6928(g); 40 C.F.R. § 19.4 (adjusting statutory penalties for inflation).

### FACTUAL BACKGROUND

### I.     The Congaree River and Congaree National Park



*Figure 1.* Aireal view of Congaree River flowing through Congaree National Park
*Photo by Mac Stone*

39.     The Congaree River originates at the confluence of the Broad and Saluda Rivers in downtown Columbia, flowing several dozen miles before merging with the Wateree River to

form the Santee River and emptying into Lake Marion. After passing the Alpek-Eastman Plant, the Congaree River flows approximately 11 miles through secluded bottomland hardwood forest before reaching Congaree National Park, which includes roughly 28 miles of river frontage.

40.    Congaree National Park is the largest protected wilderness area in South Carolina and the State's only National Park, spanning over 20,000 acres of creeks, lakes, and floodplain forest on the banks of the Congaree River. Designated as a Globally Important Bird Area and a National Natural Landmark, the Park has over 90 species of trees, including enormous bald cypress throughout, and is the largest preserved tract of old-growth bottomland forest remaining in the Southeast.



*Figure 2.* Congaree River bottomland forest in Congaree National Park
*Photo by Alan Cressler*

41.    The Congaree River and National Park support a thriving ecosystem and significant recreation, angling, and ecotourism activities. The Congaree River hosts dozens of fish species, including the annual migratory run of striped bass, the state fish of South Carolina,

13

which draws anglers to the Congaree in large numbers each spring. Endangered Shortnose Sturgeon spawning sites have been identified in the Congaree River, and the endangered Carolina Heelsplitter mussel is believed to live in the River. The floodplain forest surrounding the Congaree River is home to bobcats, deer, wild pigs, coyotes, turkeys, otters, alligators, and many species of turtles, snakes, and other animals. The National Park and surrounding forests have nearly 200 bird species, including the state-listed endangered Swallow-tailed Kite, Anhinga, Pileated Woodpeckers, and Barred Owls, and have habitat for federally-threatened Red-Cockaded Woodpeckers.

42.     Congaree National Park attracts up to 250,000 visitors each year, and even more who paddle, fish, boat, and swim on the Congaree River upstream of the Park. The Congaree River Blue Trail is a designated recreational paddling trail connecting downtown Columbia to the National Park. After passing urban Columbia, the Trail winds through undeveloped bottomland hardwood forest and around countless sandbars before entering the Park. Visitors paddle, fish, hike, swim, boat, and bird watch in and around the River, tributary creeks, and trails. Members of the Riverkeeper regularly engage in and cherish these activities in and along the River and National Park.

## II.     Public Drinking Water Sources Downstream of the Alpek-Eastman Plant

43.     In addition to the National Park, there are two water plants that draw drinking water for local communes downstream of the Plant: the Lake Marion Regional Water System and the Lake Moultrie Regional Water System. These water systems supply drinking water to thousands across rural South Carolina, including in Dorchester, Calhoun, Berkeley, and Orangeburg Counties, the Town of Santee, the City of Goose Creek, and Moncks Corner.

14

44.     Public drinking water systems often lack the advanced treatment technology needed to remove complex industrial pollution, such as 1,4-dioxane, from treated drinking water.

45.     According to SCDES, the Plant's discharges have the "potential to affect" even the further of the two water plants on Lake Moultrie (Intake #S08104). *See* Ex. 1 at 28. The Plant's discharges thus also have the potential to reach the closer of the two intakes on Lake Marion (#S38103).

### III.     The Alpek-Eastman Plant

46.     Alpek and Eastman co-operate a large industrial plant located at 570 K Avenue in Gaston, SC. The Alpek-Eastman Plant sits on a roughly 1,400-acre property on the banks of the Congaree River shortly downstream of Columbia and roughly 10 miles upstream from Congaree National Park. The Plant spans nearly three miles of the Congaree's 50 miles of riverbank.



*Figures 3 and 4.* An aerial view (above) and map (below) of the Alpek-Eastman Plant on the banks of the Congaree River.



47.     The Alpek-Eastman Plant manufactures purified terephthalic acid ("PTA") which is used to produce polyethylene terephthalate ("PET") resins, which are then formed into polyester plastic pellets—known as "nurdles"—in a fully automated manufacturing process. Raw materials for pellet production are delivered to the Plant by railcar or tank car on an off-shoot rail line operated by and exclusively serving the Plant, which enters the Plant from the northwest and terminates within the Plant's boundaries. Finished pellets are loaded onto trains or trucks and shipped out to customers via the same rail line or via K Avenue, which runs along the western boundary of the Plant. Nurdles from the Alpek-Eastman Plant are primarily used to make food and beverage packaging.

48.     The Plant opened in the 1960s and was owned by Eastman until 2011, when it was acquired by DAK Americas, LLC, a subsidiary of Alpek. After the sale, Eastman continued operating at the site with a reduced presence. In 2023, DAK Americas changed its legal name to Alpek, and the NPDES Permit for the Plant was modified to name Alpek as the permittee.

16

## IV.     The NPDES Permit

49.     In September 2018, SCDES issued the operative NPDES Permit to the Alpek-Eastman Plant. *See* Ex. 1 at 69–124. The Permit authorizes the Plant to discharge specified pollutants at specified levels into the Congaree River from a creek channel draining the property that is designated as "Outfall 001." The Alpek-Eastman Plant uses multiple designated "internal outfalls" to discharge wastewater, stormwater, and cooling water into the Outfall 001 creek, which collects, channels, and discharges these multiple inputs into the Congaree River.



*Figure 5.* Diagram of water flow pathways and outfalls from the Alpek-Eastman Plant to the Congaree River.

50.     Relevant here, the NPDES Permit does not authorize the Alpek-Eastman Plant to discharge any plastics, microplastics, or pellets. In its application for the Permit, the Plant did not disclose discharges of any such substances to SCDES. *See* Ex. 1 at 126–202  (Plant's application for the NPDES Permit).

51.     In fact, Part VI.A.2 of the Permit affirmatively forbids discharges of pellets in stormwater, stating: "Facilities that handle pre-production plastic must implement best management practices to **eliminate discharges of plastic in stormwater**. Examples of plastic material required to be addressed as stormwater pollutants include **plastic resin pellets**, powders, flakes, additives, regrind, scrap, waste, and recycling." Ex. 1 at 109 (emphasis added). The pellets manufactured by the Alpek-Eastman Plant are also referred to as "plastic resin pellets."

52.     The NPDES Permit contains a host of other provisions relevant to controlling pellet discharges:

- Part VI.A.1 of the Permit requires the Plant to "minimize the exposure of manufacturing, processing, and material storage areas (including loading and unloading, storage, disposal, cleaning, maintenance, and fueling operations) to rain, snow, snowmelt, and runoff by either locating these industrial materials and activities inside or protecting them with storm resistant coverings," with "particular attention" to be paid to spill prevention and collection systems such as "locat[ing] materials, equipment, and activities so that leaks are contained in existing containment and diversion systems," "clean[ing] up spills and leaks promptly," and "ensur[ing] that all wash water drains to a proper collection system (i.e., not the storm water drainage system)." *Id.*

- Part VI.A.2 of the Permit requires the Plant to "keep clean all exposed areas that are potential sources of pollutants." *Id.*

- Part VI.A.6 of the Permit requires the Plant to "divert, infiltrate, reuse, contain, or otherwise reduce storm water runoff, to minimize pollutants in your discharges." *Id.* at 111.

- Part VI.A.10 states that the Plant "must ensure that waste, garbage, and floatable debris are not discharged to receiving waters by keeping exposed areas free of such materials or by intercepting them before they are discharged." *Id.* at 112.

- Part VI.C.1.of the Permit prohibits "[a]n unauthorized release or discharge (e.g., spill, leak, or discharge of non-storm water not authorized by this or another NPDES permit)." *Id.* at 113.

18

53.     As to 1,4-dioxane, the Permit does not authorize the Plant to discharge this chemical, and the Plant did not disclose discharges of 1,4-dioxane in its application for the Permit. *Id.* at 126–202.

54.     As to Biochemical Oxygen Demand ("BOD"), the Permit allows discharges from Outfall 001 with a BOD of up to eleven (11) milligrams per liter (mg/L) as a daily maximum. *Id.* at 92.

## V.    The Alpek-Eastman Plant's Pollution

55.     The Alpek-Eastan Plant is polluting the Congaree River and National Park with multiple forms of harmful pollution, namely: (a) plastic pellets; (b) 1,4-dioxane; and (c) excessive BOD.

### a.  Plastic Pellet Pollution

#### i.  Scope of the Pollution

56.     Through extensive sampling, Congaree Riverkeeper has documented a large plume of microplastic pellets on the lands and waters surrounding the Plant. This pollution extends over **26 miles** downstream and spans miles along Congaree National Park.

57.     Since at least February 28, 2025, and almost certainly before then, the Plant has been releasing microplastic pellets in substantial quantities into the environment. On that date, Congaree Riverkeeper began collecting nurdles from the lands and waters surrounding the Plant, and has repeatedly collected and observed large numbers of nurdles in the following locations:

- within the Plant's Outfall 001 discharge channel;[7]
- at multiple locations along K Avenue, which forms the western boundary of the Plant and which trucks use to haul nurdles made at the Plant;[8]

---

[7] Nurdles recovered from this location on the following dates: 2/28/25, 2/28/26, 4/6/26, 4/10/26.

[8] Nurdles recovered from this location on the following dates: 4/13/25, 4/24/25, 9/9/25, 10/17/25, 1/22/26, 2/23/26, 5/9/26.

19

- and at multiple locations along the rail line operated by the Plant, where rail cars haul nurdles made at the Plant;[9]
- at multiple locations in the Congaree River shortly downstream of Outfall 001 (between 0 and 10 miles downstream from Outfall 001);[10] and
- at multiple locations in the Congaree River along Congaree National Park (between 10 and 26 miles downstream from Outfall 001).[11]



**Figure 6.** Locations of pellet recoveries by Congaree Riverkeeper.

---

[9] Nurdles recovered from this location on the following dates: 4/13/25, 4/25/25, 7/2/25, 2/23/26, 5/9/26.

[10] Nurdles recovered from these locations on the following dates: 2/28/25, 4/4/25, 5/2/25, 6/27/25, 7/18/25, 8/3/25, 11/23/25, 2/28/26, 4/6/26, 4/10/26.

[11] Nurdles recovered from this location on the following dates: 4/17/26, 5/1/26, 5/15/26.

20

58.     In total, the Riverkeeper has recovered over 10,000 pellets around and downstream of the Plant. These pellets were generally recovered in time-limited sampling events by one to four individuals and reflect only a tiny fraction of the total microplastic pollution that the Plant has released into the environment. Most pellets released by the Plant sink in water, which has largely limited the Riverkeeper to recovering pellets washed up on sandbars or from the bottom of very shallow water. Countless more plastic pellets are littered across the Congaree's river bottom.

59.     As to the land pollution, Congaree Riverkeeper has observed countless thousands of plastic pellets littered on and around K Avenue bordering the Plant and railroad tracks exclusively serving the Plant, which are used by trucks and trains to haul nurdles made at the Plant. The Riverkeeper's sampling, which only includes pellets that could be collected during short sampling events by a few people, reflects a tiny fraction of the visible pellets littered around the Plant.



*Figures 7 and 8.* Nurdles recovered by the entrance to the Alpek-Eastman Plant (left), and scattered across the grass next to the Plant and K Avenue (right). Images reflect a snapshot of total sampling and observation.

60.     Many of the plastic pellets recovered by Congaree Riverkeeper are significantly weathered. Given the weathering and the extensive downstream transport from the Plant (pellets recovered over 26 miles downstream), the Plant has likely been releasing plastics for many years.

    *ii.   Pathways and Sources of the Pollution*

61.     Plastic pellets are very small (<5mm), light weight, easy to spill if not handled properly, and highly mobile when spilled or stored on the ground in an open-air environment.

62.     Because of their small size and light weight, plastic pellets can escape into the environment in a variety of ways if not properly controlled, including via spills, wind movement, stormwater runoff, flooding, improper handling, washing or blowing by people, or tracking by people or vehicles. Once pellets reach lands or waters, they can spread over many miles.

63.     The Alpek-Eastman Plant lacks proper controls to prevent microplastic releases, as evidenced by the large plume of plastic pellets around and downstream of the Plant. Although discovery is needed to identify all of the mechanisms of release, the Plant is likely releasing pellets through multiple pathways given their mobility and the broad distribution and number of pellets recovered.

64.     One clear pathway of release is Outfall 001, where pellets have repeatedly been found by the Riverkeeper. Stormwater and wind likely move pellets into the Outfall channel, where pellets discharge into the Congaree River. Pellets likely reach Outfall 001 from multiple parts of the Plant.

65.     One notable example stands out from publicly-available imaging. Figure 9 below is an aerial photograph depicting what appear to be large piles of white plastic pellets stored in

open-air at the Plant, with pellets spilling over the right side of a small berm. Suffice it to say, these simplistic controls are inadequate to prevent microplastics releases via stormwater or wind.



*Figure 9.* Image from Google Maps of apparent piles of white plastic pellets in open air at the Alpek-Eastman Plant.

66.     Pellets may also enter Outfall 001 in the Plant's wastewater effluent. The Plant uses an extended aeration, activated sludge system to treat its wastewater. This treatment system is designed to remove basic pollutants and is not engineered to remove microplastics, which may pass through the treatment system and discharge into the Congaree River through Outfall 001. Pellets may also enter Outfall 001 in other ways, such as being spilled, washed, or blown into the Outfall by employees.

67.     Outfall 001 is not the only pathway for pellet releases. Given the pellets littering K Avenue and the railroad tracks adjacent to the Plant, trucks and trains hauling the Plant's nurdles are another clear source of pellet releases from the site. Many of these pellets likely enter the Congaree River.

68.     Stormwater, wind, and spills, tracking, blowing, or washing by people or vehicles may also carry pellets offsite outside the Outfall 001 channel—whether through other discrete conveyances such as ditches, channels, vehicles, or other equipment, or diffusely across land or water. As noted, the open-air pellet piles in Figure 9 are highly susceptible to runoff and dispersal by wind and stormwater; such pellets may exit the site through or outside of Outfall 001. If the Plant spills or stores pellets on the ground in other open-air areas of the site, then stormwater, wind, and human action may cause significant pellet releases through and outside of Outfall 001.

69.     Floodwaters are another mechanism of microplastic releases. As shown in Figure 10 below, significant portions of the Plant property and surrounding lands, including large parts of the wastewater treatment system and wastewater ponds, lie in the floodplain of the Congaree River. The Plant has likely deposited large numbers of pellets in the floodplain, including but not limited to the wastewater lagoons and the areas adjoining the railroad and industrial areas to the east. These deposits create a significant risk that floodwaters will wash pellets into the River.



*Figure 10.* 100-year floodplain of the Congaree River (depicted in teal) overlaid on the Alpek-Eastman Plant.

70.     In sum, the Plant has caused chronic and widespread releases of microplastics on the surrounding lands and waters and extending miles downstream, with multiple likely point- and non-point sources of the pollution, including Outfall 001, trains, trucks, stormwater, wind, flooding, and wastewater..

### iii.   Harms of Microplastic Pollution

71.     As reflected in the scientific literature, microplastic pollution poses significant threats to wildlife and people. When released into the environment, plastic pellets do not biodegrade and can persist for centuries, breaking up and multiplying into smaller and smaller microplastic particles.

72.     A primary threat to wildlife from plastic pellet pollution is through ingestion of pellets or their microplastic remnants, which mimic natural food sources. Studies have extensively documented microplastics inside mammals, birds, and fish. When an animal ingests plastic pellets, it is often exposed to the "cocktail of contaminants" associated with this pollution, both from the chemical ingredients in the pellets themselves, and from the heavy metals, organic pollutants (such as DDT and PCBs), and other toxins that "sorb" to pellets from surrounding waters. Ingesting nurdles and microplastics also causes direct physical harms to wildlife, as microplastics can cause lacerations, starvation, and death, and may translocate through cell membranes into tissue and impair the circulatory, lymphatic, respiratory, and other systems.

73.     Microplastics and their associated chemicals are likely bioaccumulative, meaning that they build up in the bodies of exposed animals (and people) faster than they can be excreted. Studies have shown that exposure to microplastics "can degrade the structure and functions of ecosystems. Key physiological processes of organisms (e.g., cell-division, immunity, secretion of

hormones) can be disrupted, causing disease and reducing the ability to escape predators and reproduce."[12]

74.     Microplastic pollution also carries significant risks for human health. People are exposed to microplastics in multiple ways, including by eating contaminated fish or drinking contaminated water. Eating fish contaminated with microplastics poses similar chemical and physical risks to people as it does to the fish themselves, particularly due to biomagnification up the food chain. "Plastic never goes away—it just breaks down into finer and finer particles," with exposure in humans "suspected to harm reproductive, digestive and respiratory health" and potentially also causing colon and lung cancer.[13] Recent studies link microplastic buildup in human arteries and the brain to increased risks of heart attacks, strokes,[14] and dementia.[15] In addition to the health risks, plastic pellet pollution also creates observable litter in the environment, harming the aesthetic and recreational enjoyment of recreators and the public.

75.     The harms of microplastic pollution are magnified in the case of the Alpek-Eastman Plant, where pollution has been documented along 26 miles of a popular river and a

---

[12] *E.g.*, Chelsea Rochman, *The Complex Mixture, Fate and Toxicity of Chemicals Associated with Plastic Debris in the Marine Environment, in* MARINE ANTHROPOGENIC LITTER 117, 119 (Melanie Bergmann et al. eds., 2015); U.N. ENV'T PROGRAMME, UNEP FRONTIER 2016: EMERGING ISSUES OF ENVIRONMENTAL CONCERN 38 (2016); Chelsea M. Rochman et al., *Ingested plastic transfers hazardous chemicals to fish and induces hepatic stress*, 3 SCI. REPORTS 1, 3263 (2013); Chelsea M. Rochman et al., *Classify plastic waste as hazardous*, 494 NATURE 7436, 169–71 (2013).

[13] Katia Savchuk, *Microplastics and our health: What the science says*, STANFORD MEDICINE (Jan. 29, 2025).

[14] Julie Corliss, *Microplastics in Arteries Linked to Heart Disease Risk*, HARV. HEALTH (June 1, 2024), https://www.health.harvard.edu/heart-health/microplastics-in-arteries-linked-to-heart-disease-risk.

[15] *E.g.*, Elif Gecegelen et al., *A novel risk factor for dementia: chronic microplastic exposure*, 16 FRONT NEUROL. 1 (2025).

National Park. The diverse fish and wildlife in the Congaree River and National Park are threatened by the Plant's microplastics. The pollution also harms members of Congaree Riverkeeper who swim, fish, paddle, boat, hunt, and own property along the River adjacent to and downstream from the Plant. For example, members are concerned that microplastics may taint fish in the Congaree and harm people who eat the fish. This reduces members' enjoyment of fishing and their willingness to eat fish from the River. Members have also observed pellets littered along their riverfront properties by the National Park, which harms their enjoyment of these scenic areas.

### b. 1,4-Dioxane Pollution

76.     1,4-Dioxane is a toxic chemical linked to a broad array of health problems in humans and animals. EPA and SCDES classify 1,4-dioxane as a likely human carcinogen. EPA has set a health advisory for 1,4-dioxane of 0.35 parts per billion ("ppb") in drinking water based on cancer risk. This chemical, which is a common byproduct of plastic and polyester manufacturing, is highly persistent and mobile in rivers, having been documented to travel dozens of miles downstream from a discharge in North Carolina to taint a municipal drinking water source.[16]

77.     According to its discharge monitoring reports, the Alpek-Eastman Plant routinely discharges large amounts of 1,4-dioxane into the Congaree River through Outfall 001—at levels of up to 7,100 ppb, which is over **20,000 times higher** than EPA's health advisory. Ex. 1 at 22. Over the last five years, the Plant has frequently reported discharges of 1,4-dioxane near or above 500 ppb. With high levels in its effluent, and total discharge flow averaging over 30

---

[16] *See, e.g.*, Lisa Sorg, *PW Special Report Part Two: Lax Local Regulation Allows Toxic Carcinogen to Infiltrate Drinking Water Across the Cape Fear River Basin*, NC NEWSLINE (July 23, 2020), https://perma.cc/8UYA-E6V7 (permanent link).

million gallons per day, the Plant discharges tremendous quantities of 1,4-dioxane into the Congaree: over 6,000 pounds so far in 2026, and between 27,000 and 44,000 pounds discharged in recent years according to EPA's ECHO database. According to a report by the Environmental Integrity Project, the Alpek-Eastman Plant was the Nation's second largest discharger of 1,4-dioxane in 2022.

78.     In addition to direct discharges of 1,4-dioxane from Outfall 001, the Plant is also discharging 1,4-dioxane into groundwater from several poorly-lined wastewater treatment ponds that sit in the floodplain near the banks of the Congaree River. According to the Plant's permitting materials, several wastewater ponds or basins are "earthen lined" or "clay lined." Such lining does not effectively contain 1,4-dioxane, which readily leaches and discharges through such liners. According to the Plant's groundwater monitoring reports, 1,4-dioxane has infiltrated the groundwater surrounding the Plant's wastewater ponds at levels of up to 566 ppb, Ex. 1 at 24, over 1,600 times higher than EPA's health advisory. This contaminated groundwater likely flows a short distance from under the wastewater ponds to discharge 1,4-dioxane into the Congaree River.

79.     1,4-Dioxane and other chemicals from the Plant's wastewater treatment system are also likely to enter the Congaree River via flooding. As noted above, *see supra* at 24, several ponds and other components of the wastewater treatment system and other areas of the Plant lie within the 100-year floodplain of the Congaree River. With severe rainfall and flooding projected to increase, pollutants deposited in and around the Plant and its wastewater ponds, such 1,4-dioxane and plastic pellets, are at a significant risk of washing into the Congaree River.

80.     The Alpek-Eastman Plant utilizes a wastewater treatment system that is not designed or intended to remove 1,4-dioxane and does not effectively remove 1,4-dioxane from

the Plant's wastewater discharge. The utilization of unlined treatment basins, and the placement of those basins in the floodplain, ensures further 1,4-dioxane pollution by the Plant. Until the Plant implements treatment and control technologies to effectively remove 1,4-dioxane from its effluent, groundwater, and unlined treatment system, this pollution will remain a threat to river users downstream.

81.     The Alpek-Eastman Plant's 1,4-dioxane pollution harms members of Congaree Riverkeeper who swim, fish, paddle, boat, and own property along the Congaree River adjacent to and downstream from the Plant. For example, members do not enjoy swimming or eating fish nearly as much with these toxic chemicals in the River. Given the volume of its 1,4-dioxane pollution and the persistence and mobility of this chemical, the Plant's 1,4-dioxane pollution also raises concerns regarding potential impacts to the two downstream drinking water sources on Lake Marion and Lake Moultrie. As noted, SCDES has concluded that the Plant's discharges have the "potential to affect" even the further of the two water intakes on Lake Moultrie. *See supra* at ¶ 45.

### c. Biochemical Oxygen Demand Pollution

82.     According to EPA's ECHO database, the Plant has repeatedly violated limits on Biochemical Oxygen Demand ("BOD") in its Permit, with 21 separate BOD violations reported since 2009.

83.     BOD is a key indicator of water quality, representing the amount of oxygen it takes to for bacteria and other microorganisms to remove organic matter from water through decomposition. The higher the BOD levels, the greater the degree of organic pollution in the water, which threatens oxygen levels critical to maintaining aquatic life and healthy fisheries.

29

84.     The Plant's routine violations of BOD limits in its permit—which are likely to recur given their frequent recurrence for over 15 years—indicate unacceptable levels of pollution in the Plant's effluent. These violations pose yet another threat to fish and Plaintiff's members who use the River.

## CLAIMS FOR RELIEF

### COUNT I
**The Alpek-Eastman Plant's Discharges of Plastic Pellets from Outfall 001 and Other Point Sources Violate the Clean Water Act, 33 U.S.C. §§ 1311(a), 1342**

85.     The allegations of paragraphs 1 through 84 are incorporated herein by reference.

86.     Section 301 of the Clean Water Act prohibits the discharge of "any pollutant" by any person into "waters of the United States" from any "point source" except as authorized by, among other things, a NPDES permit issued under Section 402. 33 U.S.C. §§ 1311(a), 1362(7), (12), 1342(a).

87.     Section 402(p) of the Clean Water Act specifies that a NPDES permit is also required for discharges of stormwater "associated with industrial activity." 33 U.S.C. § 1342(p)(2)(B).

88.     The Alpek-Eastman Plant has discharged, and continues to discharge, plastic pellets—also known as nurdles, resin pellets, and microplastics—from Outfall 001 and other point sources into the Congaree River. These discharges have been occurring since at least February 28, 2025, when Congaree Riverkeeper first began collecting pellets around the Plant, and almost certainly before then, given the weathering, abundance, and downstream migration of many pellets.

89.     Plastic pellets discharged from the Plant are "pollutant[s]" within the meaning of the Clean Water Act, 33 U.S.C. § 1362(6) ("The term 'pollutant' means dredged spoil, solid

30

waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water.").

90.    The Congaree River is a traditional navigable water and a "water of the United States." *Id.* § 1362(7).

91.    Outfall 001 is a "point source" treated as such in the Permit and otherwise meeting the definition of a "point source" because it is a discernible, confined, and discrete conveyance—namely, a creek channel—that collects stormwater and wastewater from the Plant and discharges into the Congaree River. *See id.* § 1362(14) ("The term 'point source' means any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are discharged or may be discharged.").

92.    The Alpek-Eastman Plant's NPDES Permit does not authorize any discharges of plastic pellets from Outfall 001, or any other point source, into the Congaree River, and neither Alpek nor Eastman disclosed discharges of any plastic pellets in the Plant's application for the Permit. "[T]o the extent that a permit holder discharges a pollutant that it did not disclose, it violates the NPDES permit and the CWA." *Piney Run Preservation Ass'n*, 268 F.3d at 268.

93.    Given the poor controls on microplastics at the Plant, it is likely that pellet discharges from Outfall 001 are being caused by multiple inputs, including stormwater, wastewater, and cooling water. All of the Plant's discharges of plastic pellets from Outfall 001, regardless of the source, are unpermitted and violate the NPDES Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a). To the extent that discharges via Outfall 001 are

occurring via stormwater, they also violate Section 402(p) of the Clean Water Act because these discharges are "associated with industrial activity" at the Plant. 33 U.S.C. § 1342(p)(2)(B).

94.     Given the broad distribution and abundance of pellets released by the Plant, Outfall 001 is likely not the only point source discharging pellets from the Plant into the Congaree River. To the extent that pellets are being discharged into the River via any "point source" other than Outfall 001—such as discharges from trucks, trains, boats, pellet handling, storage, or loading equipment, ditches, pipes, or other conveyances at or near the Plant—such discharges also violate the Clean Water Act because the Plant does not have a NPDES permit for such discharges.

95.     Alpek and Eastman both manufacture and handle plastic pellets at the Plant and contribute stormwater, wastewater, and other inputs to Outfall 001. Alpek and Eastman are both responsible for the Clean Water Act violations alleged above. Alpek and Eastman are both "person[s]" under the Clean Water Act. *See id.* § 1362(5) ("person" includes "corporation[s]").

96.     Pursuant to Section 505(a)(1) of the Clean Water Act, 33 U.S.C. § 1365(a)(1), Plaintiff Congaree Riverkeeper initiates this citizen suit to stop Alpek and Eastman from violating the NPDES Permit and Sections 301(a) and 402 of the Act. *Id.* §§ 1311(a), 1342.

## COUNT II
### The Alpek-Eastman Plant's Discharges of Plastic Pellets from Outfall 001 and other Point Sources via Stormwater Violate Multiple Provisions of the NPDES Permit

97.     The allegations of paragraphs 1 through 96 are incorporated herein by reference.

98.     Section 301 of the Clean Water Act prohibits the discharge of "any pollutant" by any person into "waters of the United States" from any "point source" except as authorized by, among other things, a NPDES permit issued under Section 402. 33 U.S.C. §§ 1311(a), 1362(7) & (12), 1342(a).

32

99.     The Alpek-Eastman Plant is discharging plastic pellets into the Congaree River via stormwater through Outfall 001 and likely other point sources on the site, such as pipes, ditches, or channels. These discharges have been occurring since at least February 28, 2025, when Congaree Riverkeeper first began collecting pellets around the Plant, and almost certainly before that date, given the weathering, abundance, and downstream migration of many pellets.

100.     The Plant's discharges of plastic pellets via stormwater violate multiple terms of the Permit, including but not limited to Part VI.A.2, which requires the Plant to implement controls "to eliminate discharges of plastic in stormwater," including "plastic resin pellets."

101.     The Plant's repeated discharges of plastic pellets via stormwater also plainly violate Part VI.C.1 of the Permit, which prohibits "[a]n unauthorized release or discharge (e.g., spill, leak, or discharge of non-storm water not authorized by this or another NPDES permit)." No NPDES permit authorizes the Plant to discharge plastic pellets, which are "non-storm water."

102.     Given the apparent poor controls on microplastic releases at the Plant, *e.g.*, *supra* at ¶¶ 63–70, and the broad distribution and abundance of pellets released by the Plant, it is highly likely that the Plant is violating other Permit requirements on stormwater controls, including:

- Part VI.A.1 (requiring the Plant to "minimize the exposure of manufacturing, processing, and material storage areas . . . to rain," to "clean up spills and leaks promptly," and to "ensure that all wash water drains to a proper collection system");

- Part VI.A.2 (requiring the Plant to "keep clean all exposed areas that are potential sources of pollutants"); and

- Part VI.A.6 (requiring the Plant to "divert, infiltrate, reuse, contain, or otherwise reduce storm water runoff, to minimize pollutants in your discharges").

103.     Although most pellets discharged by the Plant sink in water, the Riverkeeper has also observed pellets floating in Outfall 001, violating the prohibition on discharges of floatable debris in Part VI.A.10.

104. The Plant's violations of the NPDES Permit's stormwater controls as to plastic pellets constitute violations of the Clean Water Act, 33 U.S.C. §§ 1311(a), 1342(p), 1365(f).

105. Alpek and Eastman both manufacture and handle plastic pellets at the Plant and contribute stormwater discharges via Outfall 001 and other point sources to the Congaree River. Alpek and Eastman are both responsible for the Clean Water Act violations alleged above. Alpek and Eastman are both "person[s]" under the Clean Water Act. *Id.* § 1362(5) ("person" includes "corporation[s]").

106. Pursuant to Section 505(a)(1) of the Clean Water Act, 33 U.S.C. § 1365(a)(1), Plaintiff Congaree Riverkeeper initiates this citizen suit to stop Alpek and Eastman from violating the NPDES Permit and Sections 301(a) and 402 of the Clean Water Act. 33 U.S.C. §§ 1311(a), 1342.

### COUNT III
**The Alpek-Eastman Plant's Unpermitted Discharges of 1,4-Dioxane from
Outfall 001 and other Point Sources Violate the NPDES Permit
and the Clean Water Act, 33 U.S.C. §§ 1311(a), 1342**

107. The allegations of paragraphs 1 through 106 are incorporated herein by reference.

108. Section 301 of the Clean Water Act prohibits the discharge of "any pollutant" by any person into "waters of the United States" from any "point source" except as authorized by, among other things, a NPDES permit issued under Section 402. 33 U.S.C. §§ 1311(a), 1362(7) & (12), 1342(a).

109. The Alpek-Eastman Plant is discharging large amounts of 1,4-dioxane from Outfall 001 into the Congaree River.

110. As noted, Outfall 001 is a "point source" and the Congaree River is a "water of the United States."

111.     1,4-dioxane discharged by the Plant is a "pollutant." 33 U.S.C. § 1362(6) ("The term 'pollutant' means . . . chemical wastes . . . and industrial . . . waste discharged into water," among other things).

112.     In addition to Outfall 001, the Alpek-Eastman Plant discharges wastewater through pipes and other conveyances into several man-made ponds created and designed to collect, treat, convey, and then discharge the Plant's wastewater. These wastewater ponds and other infrastructure are sited in the floodplain near the banks of the Congaree River. The ponds are poorly lined and not equipped to contain 1,4-dioxane, which is present in the wastewater discharged into the ponds. From the ponds, 1,4-dioxane leaches and discharges into groundwater at high levels. The 1,4-dioxane then flows a short distance to discharge into the Congaree River via groundwater. The pipes, conveyances, and man-made ponds in the Plant's treatment system––which are discharging 1,4-dioxane via groundwater into the Congaree River—all constitute "point sources" under the Clean Water Act. *See* 33 U.S.C. § 1362(14) (defining "point source").

113.     Given the high levels of 1,4-dioxane in the groundwater (up to 566 ppb in recent monitoring reports); the short distance between the wastewater ponds and other points sources and the Congaree River; and the high mobility, permeability, and persistence of 1,4-dioxane in soil and water, among other factors, the Plant's discharges of 1,4-dioxane via groundwater are likely the "functional equivalent" of a direct discharge to the Congaree River. *See Cty. of Maui*, 590 U.S. at 183–84.

114.     The NPDES Permit does not authorize any discharges of 1,4-dioxane by the Alpek-Eastman Plant, which did not disclose discharges of 1,4-dioxane to the Congaree in its application for the Permit.

115. The Plant's discharges of 1,4-dioxane into the Congaree River via: (*i*) Outfall 001, and (*ii*) via the wastewater ponds, pipes, and other conveyances through groundwater, are all unpermitted and violate the NPDES Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

116. As to the unpermitted discharges from Outfall 001, these violations have been occurring since at least July 1, 2020, the earliest date on which Congaree Riverkeeper possesses a discharge monitoring report indicating the presence of 1,4-dioxane in the Plant's effluent.

117. As to the unpermitted discharges from the wastewater ponds and other point sources, these violations have been occurring since at least January 2020, the earliest date on which Congaree Riverkeeper possesses a groundwater monitoring report indicating the presence of 1,4-dioxane in the groundwater under the Plant's wastewater treatment system.

118. Further, the Plant's five-plus years of leaking, seeping, spilling, and/or discharging 1,4-dioxane into groundwater from its improperly-lined wastewater treatment system violates Part II.E.6.c of its NPDES Permit, which requires "all reasonable steps" to be taken "to stop and mitigate the impact of releases of wastewater to the environment." As the Permit expressly states, such "permit noncompliance constitutes a violation of the Clean Water Act."

119. Alpek and Eastman both conduct manufacturing operations at the Plant and both generate and discharge wastewater into the treatment system and through Outfall 001. Alpek and Eastman are both responsible for the Clean Water Act violations alleged above. Alpek and Eastman are both "person[s]" under the Clean Water Act. *Id.* § 1362(5) ("person" includes "corporation[s]").

120. Pursuant to Section 505(a)(1) of the Clean Water Act, 33 U.S.C. § 1365(a)(1), Plaintiff Congaree Riverkeeper initiates this citizen suit to stop Alpek and Eastman from

violating the NPDES Permit and Sections 301(a) and 402 of the Clean Water Act. 33 U.S.C.

§§ 1311(a), 1342.

<u>COUNT IV</u>
**The Alpek-Eastman Plant's Routine Exceedances of Permit Limits for Biochemical Oxygen Demand Violate the NPDES Permit and the Clean Water Act,  33 U.S.C. §§ 1311(a), 1342**

121.    The allegations of paragraphs 1 through 120 are incorporated herein by reference.

122.    Section 301 of the Clean Water Act prohibits the discharge of "any pollutant" by

any person into "waters of the United States" from any "point source" except as authorized by,

among other things, a NPDES permit issued under Section 402. 33 U.S.C. §§ 1311(a), 1362(7) &

(12), 1342(a).

123.    The violation of a NPDES permit condition constitutes a violation of the Clean

Water Act. *Id.* § 1365(f).

124.    The Alpek-Eastman Plant has routinely violated NPDES Permit limits for BOD

for over a decade. According to EPA's ECHO database, these violations have occurred at least 21

times since 2009:

- 9/30/2009 (discharge of 15.70 mg/L from Outfall 001; permit limit = 11 mg/L daily maximum);
- 12/31/2009 (discharge of 15 mg/L from Outfall 001);
- 12/31/2009 (discharge of 375 kg/d from internal Outfall 01F; permit limit = 372 kg/d daily maximum);
- 1/31/2010 (discharge of 14 mg/L from Outfall 001);
- 3/31/2010 (discharge of 33 mg/L from Outfall 001);
- 12/31/2010 (discharge of 12 mg/L from Outfall 001);
- 1/31/2011 (discharge of 14 mg/L from Outfall 001);
- 2/28/2011 (discharge of 17 mg/L from Outfall 001);
- 3/31/2011 (discharge of 13 mg/L from Outfall 001);
- 8/31/2011 (discharge of 29 mg/L from Outfall 001);

- 8/31/2014 (discharge of 13 mg/L from Outfall 001);
- 12/31/2016 (discharge of 15 mg/L from Outfall 001);
- 3/31/2019 (discharge of 13 mg/L from Outfall 001);
- 9/30/2020 (discharge of 34 mg/L from Outfall 001);
- 10/31/2022 (discharge of 17 mg/L from Outfall 001);
- 12/31/2023 (discharge of 22 mg/L from Outfall 001);
- 3/31/2024 (discharge of 12 mg/L from Outfall 001);
- 12/31/2024 (discharge of 24 mg/L from Outfall 001);
- 1/31/2025 (discharge of 22 mg/L from Outfall 001);
- 2/28/2025 (discharge of 559 kg/d from internal Outfall 01F);
- 2/28/2025 (discharge of 186 kg/d from internal Outfall 01F; permit limit = 141 kg/d).

125.     The frequency, duration, and consistency of these violations, for a period of over 15 years, indicates that they are substantially likely to recur and are thus continuing violations for Clean Water Act purposes.

126.     Alpek and Eastman both conduct manufacturing operations at the Plant and both generate and discharge wastewater into the treatment system and through Outfall 001. Alpek and Eastman are both responsible for the Clean Water Act violations alleged above. Alpek and Eastman are both "person[s]" under the Clean Water Act. *Id.* § 1362(5) ("person" includes "corporation[s]").

127.     Pursuant to Section 505(a)(1) of the Clean Water Act, 33 U.S.C. § 1365(a)(1), Plaintiff Congaree Riverkeeper initiates this citizen suit to stop Alpek and Eastman from violating the NPDES Permit and Sections 301(a) and 402 of the Act. *Id.* §§ 1311(a), 1342.

### COUNT V
**The Alpek-Eastman Plant's Handling, Storage, Treatment, and Disposal of Microplastics May Present an Imminent and Substantial Endangerment to Health or the Environment in Violation of Section 7002(a)(1)(B) of RCRA, 42 U.S.C. § 6972(a)(1)(B)**

128.     The allegations of paragraphs 1 through 127 are incorporated herein by reference.

38

129.     Section 7002(a)(1)(B) of RCRA authorizes citizens to bring suit "against any person . . . including any past or present generator, past or present transporter, or past or present owner or operator of a treatment, storage, or disposal facility, who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment." 42 U.S.C. § 6972(a)(1)(B).

130.     Since at least February 28, 2025, Alpek and Eastman have generated, handled, stored, treated, transported, and disposed of immense numbers of plastic pellets in and around the Alpek-Eastman Plant, its stormwater and wastewater infrastructure, the Congaree River stretching at least 26 miles downstream from the Plant, and along at least 15 miles of the Congaree National Park. On that date, Congaree Riverkeeper first began collecting plastic pellets around the Plant. As discovery will show, the Plant's microplastic pollution began long before that date.

131.     These plastic pellets are "solid waste" under RCRA, 42 U.S.C. § 6903(27). *Charleston Waterkeeper*, 488 F. Supp. 3d at 254–57 (plastic pellets released into Charleston Harbor are "solid waste" under RCRA). When handling large quantities of plastic pellets, as the Plant does, the pellets also constitute "hazardous waste" under RCRA because they "pose a substantial present or potential hazard to human health or the environment when improperly treated, stored, transported, or disposed of, or otherwise managed." 42 U.S.C. § 6903(5).

132.     Alpek and Eastman are "person[s]" under RCRA, 42 U.S.C. § 6903(15) (defining "person" to include a "corporation"), and are also past and present generators and transporters of solid and hazardous waste (plastic pellets) and owners and operators of a facility—the Alpek

39

Eastman Plant—that handles, treats, transports stores, and disposes of such waste. *Id.* §

6972(a)(1)(B).

133.    As detailed above, Congaree Riverkeeper has documented plastic pellets littering

the lands, roadways, and rail lines surrounding the Plant, and stretching downstream for miles in

the Congaree River and along Congaree National Park. The microplastics pollution released by

the Plant poses significant threats to fish, wildlife, aquatic ecosystems, and people. These harms

are particularly concerning given the pollution discovered along the National Park—a prized

fishing and recreational treasure—and given the municipal drinking water sources downstream

of the Plant.

134.    The Plant's past and ongoing releases of large numbers microplastic pellets into

the environment is causing and contributing to conditions "which may present an imminent and

substantial endangerment to health or the environment" in violation of RCRA, 42 U.S.C. §

6972(a)(1)(B).

<u>**COUNT VI**</u>
**The Alpek-Eastman Plant's Disposal of Microplastics, 1,4-Dioxane, and other Solid and
Hazardous Wastes in the Floodplain Constitutes 'Open Dumping' in
Violation of Section 4005(a) of RCRA, 42 U.S.C. § 6945(a)**

135.    The allegations of paragraphs 1 through 134 are incorporated herein by reference.

136.    Section 4005(a) of RCRA prohibits "any solid waste management practice or

disposal of solid waste or hazardous waste which constitutes the open dumping of solid waste or

hazardous waste[.]" 42 U.S.C. § 6945(a).

137.    RCRA defines "open dump" as "any facility or site where solid waste is disposed

of which is not a sanitary landfill and which meets the criteria promulgated under section 6944 of

this title and which is not a facility for disposal of hazardous waste." 42 U.S.C. § 6903(14).

138.     The Alpek-Eastman Plant—including the industrial, manufacturing, and wastewater treatment areas; the rail lines and roads leading into and adjoining the Plant; and the floodplain areas on the eastern side of the Plant—is neither a "sanitary landfill" nor "a facility for disposal of hazardous waste."

139.     Nevertheless, the Plant has disposed and is disposing of solid and hazardous wastes in and around the Plant, including but not limited to the Plant's poorly-lined wastewater ponds, open-air pellet piles, railways, roads, floodplain areas in and around the Plant, and in the Congaree River. These solid and hazardous wastes include 1,4-dioxane and microplastic pellets.

140.     These wastes constitute "solid waste" under RCRA, 42 U.S.C. § 6903(27), because they are escaping and leaching from the Plant into groundwater, lands, and/or surface waters around the Plant contrary to "their intended use." *Charleston Waterkeeper*, 488 F. Supp. 3d at 256. 1,4-Dioxane and microplastic pellets also constitute "hazardous waste" under RCRA because they pose a "substantial present or potential hazard to human health or the environment when improperly treated, stored, transported, or disposed of, or otherwise managed." 42 U.S.C. § 6903(5).

141.     These wastes are discarded and "disposed of" because Alpek and Eastman discharge, deposit, spill, leak, and/or place plastic pellets and 1,4-dioxane in numerous areas of "land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters." 42 U.S.C. § 6903(3) (defining "disposal").

142.     For example, Alpek and Eastman place microplastic pellets into large open-air piles with poor containment features, *see* Figure 9, and spill them from trucks, trains, and other equipment in a manner that causes pellets to be released into the environment and discharged

into the Congaree River. Alpek and Eastman also discharge and deposit 1,4-dioxane into poorly-lined wastewater ponds, which leach and discharge 1,4-dioxane into groundwater and into the Congaree River.

143.    The Plant and adjacent areas constitute an "open dump" which "meets the criteria promulgated under section 6944 of" RCRA. *Id.* § 6903(14). Specifically, the Plant's disposal of solid wastes in the Congaree River and numerous areas in or directly adjacent to the 100-year floodplain "result[s] in washout of solid waste," defined as the "carrying away of solid waste by waters" of at least a 100-year flood. 40 C.F.R. § 257.3-1(b)(1), (3). Such washout poses a "hazard to human life, wildlife, [and] land [and] water resources," *id.* § 257.3-1(a), by washing toxic microplastics and 1,4-dioxane into the Congaree River, Congaree National Park, and potentially to the public drinking water sources downstream.

144.    These RCRA violations, with respect to 1,4-dioxane, have been occurring since at least January 2020, the earliest date on which Congaree Riverkeeper possesses a groundwater monitoring report indicating the presence of 1,4-dioxane in the groundwater under the Plant's wastewater treatment system. With respect to microplastics, these violations have been occurring since at least February 28, 2025, the date when Congaree Riverkeeper began collecting plastic pellets around the Plant. Upon information and belief, discovery will show that unlawful open dumping was occurring before these dates and is continuing to occur at the Plant.

145.    Pursuant to Section 7002(a)(1)(A) of RCRA, 42 U.S.C. § 6972(a)(1)(A), Plaintiff Congaree Riverkeeper initiates this citizen suit to cease and remediate the Plant's "open dumping" of solid and hazardous waste in violation of Section 4005(a) of RCRA, *id.* § 6945(a).

42

## PRAYER FOR RELIEF

For the reasons stated herein, Plaintiff respectfully requests that the Court:

146.    Declare that the Alpek-Eastman Plant's discharges of plastic pellets from Outfall 001 and other point sources violate Sections 301(a) and 402 of the Clean Water Act, 33 U.S.C. §§ 1311(a), 1342;

147.    Declare that the Plant's inadequate controls and resulting discharges of plastic pellets from Outfall 001 and other point sources via stormwater violate Parts VI.A.1, VI.A.2, VI.A.6, VI.A.10, and VI.C.1 of the NPDES Permit and Sections 301(a) and 402 of the Clean Water Act, 33 U.S.C. §§ 1311(a), 1342;

148.    Declare that the Plant's discharges of 1,4-dioxane from Outfall 001 and other point sources violate Sections 301(a) and 402 of the Clean Water Act, 33 U.S.C. §§ 1311(a), 1342;

149.    Declare that the Plant's exceedances of NPDES Permit limits for biochemical oxygen demand violate the NPDES Permit and Sections 301(a) and 402 of the Clean Water Act, 33 U.S.C. §§ 1311(a), 1342;

150.    Declare that the Alpek-Eastman Plant's handling, storage, treatment, transportation, and disposal of plastic pellets may present an imminent and substantial endangerment to health or the environment, in violation of Section 7002(a)(1)(B) of RCRA, 42 U.S.C. § 6972(a)(1)(B);

151.    Declare that the Alpek-Eastman Plant's disposal of plastic pellets, 1,4-dioxane, and other solid and hazardous waste in the Congaree River and in the floodplain and adjacent areas constitutes "open dumping" in violation of Section 4005(a) of RCRA, 42 U.S.C. § 6945(a);

152.    Order and enjoin Alpek and Eastman:

43

i. From discharging plastic pellets from Outfall 001 or other point sources at the Plant;

ii. From discharging plastic pellets via stormwater from Outfall 001 or other point sources at the Plant;

iii. To implement proper stormwater management practices as required by the NPDES Permit;

iv. From discharging 1,4-dioxane from Outfall 001 or other point sources at the Plant;

v. To cease handling, storing, treating, transporting, and disposing of plastic pellets in a manner that causes or contributes to an imminent and substantial endangerment to health or the environment;

vi. To take necessary and appropriate action to eliminate and/or remediate the imminent and substantial endangerment to health or the environment caused by the Plant's plastic pellets;

vii. From disposing of plastic pellets, 1,4-dioxane, and other solid and hazardous waste in the floodplain and Congaree River; and

viii. To take necessary and appropriate action to remediate the conditions constituting open dumping at and around the Plant.

153. Assess appropriate civil penalties against Alpek and Eastman for their violations of the Clean Water Act and RCRA;

154. Award Plaintiff its reasonable fees, costs, and expenses, including attorneys' fees, associated with this litigation; and

155.    Grant Plaintiff such further and additional relief as the Court may deem just and proper.

Respectfully submitted this 18th day of June 2026.

/s/ Carl T. Brzorad
Carl T. Brzorad
SC Bar No. 105413
Southern Environmental Law Center
525 East Bay Street, Suite 200
Charleston, South Carolina 29403
Telephone: (843) 720-5270
cbrzorad@selc.org

/s/ Catherine M. Wannamaker
Catherine M. Wannamaker
SC Bar No. 12577
Southern Environmental Law Center
525 East Bay Street, Suite 200
Charleston, South Carolina 29403
Telephone: (843) 720-5270
cmwannamaker@selc.org

*Attorneys for Plaintiff Congaree Riverkeeper*

45